UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                                                    Chapter 7

RS OLD MILL, LLC,                                             Case No.: 17-22218 (RDD)

                 Debtor.

------------------------------------------------------------x

## CPIF LENDING LLC'S RESPONSE TO THE
## OBJECTIONS TO THE PROPOSED SETTLEMENT

Before the Court is the Motion for an Order, pursuant to 11 U.S.C. §§105(a), 363(b)(1), and 363(m) and Rules 2002, 6004 and 9019 of the Federal Rules of Bankruptcy Procedure, Approving Settlement between Chapter 7 Trustee and Suffern Partners LLC and Sale of Properties in accordance with a Stipulation of Settlement ("Motion"), of Marianne T. O'Toole, solely in her capacity as Chapter 7 Trustee ("Trustee") of the Estate of RS Old Mill, LLC ("Debtor"). The Trustee is seeking the Court's approval of settlement between the Trustee and Suffern Partners LLC ("Suffern"). The stipulation of settlement ("Stipulation of Settlement"), *inter alia*, includes the Court's (1) nunc pro tunc ratification of Debtor's transfer real property on September 5, 2017 to RS Old Mills **Rd,** LLC, (consummated without this Court's approval); (2) Suffern's payment of two million five hundred thousand dollars ($2.5 million) to the Trustee, to serve as a claim fund for the payment of all administrative expenses and/or allowed claims against Debtor's Estate; and (3) a discontinuance of the adversary proceeding as it relates to the title of the subject premises.

       CPIF Lending, LLC ("CPIF") submits this response to the Objections of the United States Trustee ("U.S. Trustee Objection") dated September 20, 2019, and to the

Objections of Yehuda Salamon dated September 27 and 29, 2019 ("Salamon Objection"), and in further support of the Court's approval of the Motion.[1]

There is no dispute CPIF lent $33 million to Suffern, to fund Suffern's purchase of the premises from RS Old Mills **Rd,** LLC. In exchange for this loan, Suffern received a $33 million mortgage secured against the premises (and two parcels of property in Kings County). There is also no dispute that $15,940,321.51 of the CPIF loan proceeds were used for the Debtor's initial purchase of the Novartis Property from Novartis on September 1, 2017. There is also no dispute that $13,763,840.88 of the CPIF loan proceeds were paid to the Debtor's counsel, Tom Landrigan, Esq., ostensibly for the benefit of creditors.

CPIF is therefore a bona fide encumbrancer with respect to the $33 million CPIF Mortgage. Absent the Court's nunc pro tunc ratification of the sale to RS Old Mills **Rd,** LLC (thereby also ratifying the $33 million mortgage Suffern granted CPIF that is secured against the Novartis Property), CPIF will suffer the greatest harm of all parties involved. The establishment of the $2.5 million Claim Fund is unequivocally in the best interest of the creditors of the Debtor's Estate. This fund creates the most value to the Debtor's Estate, and clearly does not "fall below the lowest point in the range of reasonableness." In re Teltronics Serv., Inc., 762 F.2d 185 (2d Cir. 1985).

For these reasons and for the reasons stated in the Trustee's moving papers, the Objections do not challenge the settlement's legitimate value to the Debtor's Estate, or any ground relevant to the settlement's approval.

---

[1] Objections to Motion were also filed by Romaro LLC, Beauty Brags, and Ell City on September 29, 2019 (ecf nos. 150, 151, 152) which set forth no substantive basis to deny the motion. The US Trustee's and Salamon's objections are collectively referred to as the "Objections".

2

## LEGAL STANDARD FOR APPROVAL OF SETTLEMENTS

1. A bankruptcy court may approve a settlement pursuant to Bankruptcy Rule 9019 if it "is fair, reasonable and adequately based on the facts and circumstances" before the Court. In re McCoy, 496 B.R. 678, 683 (Bankr. E.D.N.Y. 2011). "As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged . . . because they minimize the costs of litigation and further the parties' interest in expediting the administration of a bankruptcy estate." Id. (internal citations omitted).

2. In determining whether to accept the settlement, the only issue presented is whether settlement is fair and equitable, above "the lowest point in the range of reasonableness," and in the best interests of the estate at issue. Liu v. Silverman, 166 F.3d 1200 (2d Cir. 1998) citing Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968). "It is not necessary for the bankruptcy court to rule on disputed issues of fact and law or to conduct a 'mini trial' on the merits of the underlying litigation." In re McCoy, 496 B.R. 678, 683 (Bankr. E.D.N.Y. 2011) citing In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993).

## FACTUAL HISTORY

3. On or about November 28, 2016, Debtor entered into an $18 million purchase agreement with Novartis Corporation ("Novartis") and tendered a $2.5 million down payment to bind its agreement to purchase three properties located in Rockland County, New York ("Novartis Agreement").[2]

4. Three months later, on February 13, 2017, Debtor filed a Chapter 11 petition in this Court. According to Debtor, its only asset at the time was the Novartis

---

[2] The three properties (collectively "Novartis Property") consist of the properties located at: (1) 25 Old Mill Road, Suffern, NY 11901 (Block 1, Lot 1), (2) 19 Hemion Road, Montebello, NY 10901 (Block 1, Lot 1), and (3) Route 59, Suffern, NY 10901 (Block 1, Lot 31").

Agreement. Notably, it was the February 13, 2017 filing that stayed Novartis's efforts to declare the Debtor in default of the Novartis Agreement, which would have permitted Novartis to retain the entire $2.5 million deposit pursuant to the terms of the Novartis Agreement.

5.    By Orders dated On July 13, 2017 and August 14, 2017, this Court authorized the Debtor to assume the Novartis Agreement. The Debtor's purchase of the Novartis Property closed on or about September 1, 2017.

6.    The Novartis Property was transferred from Novartis to the Debtor by deed dated September 1, 2017 and recorded on September 14, 2017. The purchase price was $18 million.

7.    By deeds dated September 5, 2017 and recorded September 14, 2017, the Novartis Property was transferred by the Debtor to RS Old Mills **Rd,** LLC, for no consideration. Yehuda Salamon, as sole member of the Debtor, signed this deed on behalf of the grantor Debtor. Mr. Salamon did not obtain Court approval for this transfer. Mr. Landrigan, as closing counsel for the Debtor, also did not seek prior Court approval. The Debtor's court approved retained counsel, Douglas Pic, Esq., also did not seek prior Court approval. It is this transfer that the Debtor now seeks to vacate in its adversary proceeding.

8.    The Novartis Property was then transferred on or about September 5, 2017 by RS Old Mills **Rd,** LLC to Suffern for $33 million. Avraham Kaufman, believed to be a family member of Yehuda Salamon, signed the deed on behalf of RS Old Mills **Rd,** LLC.

9.    In order to fund Suffern's acquisition of the Novartis Property, Suffern obtained the $33 million mortgage loan from CPIF, which as a material condition thereof, required Suffern to grant a mortgage against the Novartis Property (and two additional properties located in Kings County). The CPIF mortgage is dated August 31, 2017 and was recorded on September 22, 2017 ("CPIF Mortgage").

4

10. At the September 5, 2017 closing of Suffern's purchase of the Novartis Property from RS Old Mills **Rd,** LLC, the CPIF Mortgage's loan proceeds in the amount of $15,940,321.51 were paid to satisfy the balance owed on the purchase price to Novartis by the Debtor (pursuant to the Novartis Agreement). It is not disputed that, but for the transfer of the CPIF Mortgage's proceeds in the amount of $15,940,321.51 transmitted to Novartis (on the Debtor's behalf), the Debtor could not have purchased the Novartis Property. The Debtor therefore, in all likelihood, would have forfeited the $2.5 million deposit.

11. Pursuant to this closing, additional CPIF Mortgage loan proceeds in the amount of $13,763,840.88 were paid to Debtor's counsel, Tom Landrigan. Mr. Landrigan had previously filed with this Court a letter representing he was the Debtor's closing counsel. (Ecf no. 57).

12. On November 1, 2017 the scheduled creditors (including Romaro, LLC), filed consents (ecf no. 67) with the Debtor to voluntarily dismiss the Debtor's Chapter 11 case, on the basis that all of their claims had been paid in full (with the CPIF loan proceeds).

13. But for the Court's entry of a final order dismissing the Chapter 11 case based on consent, this matter appeared to be resolved. However, Romaro, which previously represented it was paid at closing (Ecf no. 67), filed an objection to the dismissal on December 14, 2017 on the basis it was owed $115,000. (Ecf no. 74).

14. On March 29, 2019, the Debtor commenced the Adversary Proceeding No. 19-08243 (RDD) by filing an adversary complaint against *inter alia,* Suffern, RS Old Mills **Rd,** LLC, and CPIF. The Debtor seeks to set aside the September 5, 2017 transfer to RS Old Mills **Rd,** LLC, as a "fraudulently induced conveyance."

15. Suffern filed a motion on April 19, 2019 seeking an Order (1) approving the sale of the Novartis Property to Suffern, *nunc pro tunc* to September 1, 2017, (2) dismissing

the Debtor's Chapter 11 case, and (3) dismissing all claims asserted against Suffern in the Adversary Proceeding.

16. At a June 4, 2019 hearing, the Court determined it was "in the best interests of creditors" to convert the Debtor's case to one under Chapter 7. By Order dated June 5, 2019, the case was converted to a Chapter 7 case, an accounting of the CPIF mortgage loan proceeds was directed, and Marianne T. O'Toole was appointed as the Chapter 7 Trustee of the Debtor's Estate.

17. August 30, 2019 was fixed as the deadline to file proofs of Chapter 11 administrative expense claims. October 24, 2019 was fixed as the deadline to file proof of claims against Debtor's Estate. To date, (excluding duplicates, withdrawn claims, and the proof of claim filed by Novartis), the meritorious claims filed against the Debtor's Estate (which are subject to the Trustee's review and any objections thereto) total approximately $300,000.00.

18. In order to avoid the costs and risk of litigation, the Trustee filed the Motion on the basis agreement embodied in the Stipulation of Settlement falls well above the lowest level of reasonable.

## I. THE U.S. TRUSTEE'S OBJECTION DOES NOT RAISE A RELEVANT CHALLENGE TO THE SETTLEMENT

19. The U.S. Trustee Objection does not challenge the settlement's value to the Debtor's Estate or any ground relevant to the approval of the Motion. Instead, the U.S. Trustee seeks denial of the Motion for two reasons: (1) Suffern should not be rewarded for its participation in the September 5, 2017 sale that was conducted "without regard to applicable bankruptcy law," and (2) the Chapter 7 Trustee should explain whether the $2.5 million settlement payment by Suffern is "reasonable under the circumstances."

20. Critically, the gravamen of US Trustee's Objection does not appear to be based on the transfer of the Novartis Property by Debtor to RS Old Mills **Rd**, LLC, (which is the

6

only conveyance the Motion seeks the Court to ratify) – but is based entirely on the conveyance by RS Old Mills **Rd,** LLC to Suffern, and the U.S. Trustee's desire to investigate the facts and parties involved in this transfer. Specifically, the U.S. Trustee asserts that "[t]he Court should not grant Section 363(m) relief under the circumstances absent some explanation by Suffern."[3]

21.  However, as reiterated in the Trustee's Motion and more specifically in the Stipulation of Settlement, the Motion has been brought before the Court for consideration after extensive investigation and litigation by the Trustee into the surrounding circumstances, and after a thorough consideration of the settlement under the Bankruptcy Rules in Motorola, Inc. v. Official; Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) ("Iridium Test"). As clearly delineated in the Motion, the Trustee has determined in her business judgment that the settlement is fair, reasonable, and within the standards of the Iridium Test, and is unequivocally in the best interest of the Debtor's Estate as it provides for a cash infusion of $2.5 million to the Debtor's Estate.

22.  In addition, the court's approval of the sale of the Properties from Debtor to RS Old Mills **Rd,** LLC will not foreclose the Trustee's investigation or preclude the Trustee from pursuing other claims against other parties or entities, including Suffern. As clearly identified by the Trustee in her Motion, the Stipulation of Settlement provides for the settlement of the core litigation over ownership of the Novartis Property (which is the subject of costly and protracted litigation), and also provides for the cash payment of $2.5 million Claim Fund from Suffern into the Debtor's Estate.

---

[3] The U.S. Trustee also asserts that the Motion should be denied because the Trustee "has also not demonstrated that the consideration paid by Suffern is sufficient [and] [t]here is no reason to limit the recovery against Suffern if expected claims exceed $2.5 million."

## II. THE SALAMON OBJECTION ALSO FAILS TO RAISE ANY ISSUE RELEVANT TO APPROVAL OF THE SETTLEMENT

23. The Salamon Objection is based on non-meritorious and self-serving arguments, and attempts to present an improper counterproposal to the Stipulation of Settlement.[4] Salamon seeks to "revest in the Debtor ownership of the Properties," which he now claims (based on a fictitious appraisal) have an appraised value between $115 million and $144 million. The Salamon Objection, including the supplemental objection improperly filed on September 29, 2019, assert that: (i) the benefit of the proposed settlement to the Debtor's Estate cannot be determined at this time because the bar date has not yet passed, (ii) the settlement improperly cuts off the right of equity to surplus funds in the Debtor's Estate; (iii) the settlement with Suffern is illusory since Suffern retains the right to all surplus after the payment of claims in the Estate with the Trustee, (iv) the Novartis Property should be sold under 11 U.S.C. § 363 to the highest bidder, and (v) "the fraud committed by Suffern, with its intended purpose of stripping the Debtor of the benefit of the Novartis contract, was a carefully calculated and engineered scheme to directly defraud this Court and to subsequently cover up that fraud."

24. Debtor's sole principal Yehuda Salamon was a willing participant in the "carefully calculated and engineered scheme" he alleges occurred. Not surprisingly, the Salamon Objection makes no reference to the fact that the deed he now seeks for this Court to void – the deed that conveyed the Novartis Property from the Debtor to RS Old Mills **Rd**, LLC – was duly signed and executed by Yehuda Salamon. It is this deed from the Debtor to RS Old Mill **Rd**, LLC (signed by Yehuda Salamon as the principal of the Debtor) that the Trustee seeks for this Court to ratify.

---

[4] Salamon made an offer to purchase the Estate's rights to pursue the Adversary Proceeding as well as all claims the Estate may have against him for the sum of $2,600,000.

8

25. The Debtor's dispute has no relationship to this bankruptcy proceeding or the transaction that the Trustee seeks for this Court to approve. Instead, the Debtor's dispute relates to an alleged side-deal, whereby the Debtor's principal Yehuda Salamon alleges he was supposed to obtain an equity interest in Suffern.[5] In the Adversary Complaint, the Debtor specifically identifies that it was his intention, that after the Debtor acquired title to the Novartis Property, the Debtor would "resale" the Novartis Property to a third entity [Suffern] for a purchase prices of $30 million, "leaving an excess of $12 million over the $18 million purchase prices that the Debtor was required to pay Novartis. The Debtor intended the creditors would be paid from those excess funds, or that the Debtor or its assignee would be given a majority equity interest in the ultimate acquiring entity [Suffern] and have its principals pay its creditors directly." *See* Adversary Complaint, ¶49.

26. In point of fact, Mr. Salamon is a swindler. He transferred the Novartis Property to RS Old Mills **Rd,** LLC for no consideration. RS Old Mills **Rd,** LLC is a shell company - Avrohom Kaufman, who is believed to be the brother-in-law of Yehuda Salamon, was the straw person who signed the deed (from RS Old Mills **Rd,** LLC to Suffern for $30 million) five days after Mr. Salamon's execution of the deed to RS Old Mills **Rd,** LLC. Mr. Salamon did not advise the Court of these transactions in monthly operating reports. (Ecf nos. 69, 70). Rather, Mr. Salamon sought to hide the facts by seeking to have the bankruptcy voluntarily dismissed in or about November 1, 2017.

27. Moreover, Mr. Salamon's posturing as an unwitting stooge is belied by the fact $700,000 of the loan proceeds was transferred by Mr. Landrigan to Star Foods. Mr. Salamon had no explanation for this transfer. See pages 33-38 of his creditor's meeting testimony. (Ex. A). Notably, Mr. Salamon also owns a grocery store called Yidel's

---

[5] *See* Response of Levine & Associates, P.C. to the Objections of Adversary Proceeding Defendants to the Proposed Retention of Levine & Associates, P.C. as Special Litigation Counsel to the Debtor, fn 10.

9

Supermarket. Brian Condon, who filed the objection to the dismissal on December 14, 2017 on behalf of Romaro, has also coincidentally represented Mr. Salamon in a dispute against a lender in another matter. Also, a proof of claim was filed belatedly by David Salamon, the son of Yehuda Salamon.

28. Mr. Salamon would have this Court believe that the Novartis Property, sold by Novartis on September 1, 2017 to the Debtor for $18,000,000, and upon information and belief, valued by Suffern on September 5, 2017 for $20,000,000, was worth as of the June 26, 2018 appraisal, between $115 and $144 million; a fivefold appreciation in nine months! He therefore claims he, as the principal of the Debtor, will be deprived equity in the Novartis Property if the Stipulation of Settlement were approved. This is just more smoke and mirrors by Mr. Salamon. The appraisal attached to his Objection recited "extraordinary assumptions" in making the valuation. There is nothing in the record to support these assumptions are factual.

29. Specifically, the "Appraisal" attached as Exhibit A to the Salamon Objections, is not based on the present condition of the Novartis Property. Instead, the Appraisal is based on "extraordinary assumptions," that 80% of the improvements of the current corporate complex are repurposed for indoor and outdoor sports, hotel and multiple restaurants. This is an appraisal of an entirely different improvement with no accounting for the cost to repurpose the premises.

30. Also, Salamon's proposal fails to provide any benefit to the creditors of the Debtor's Estate. Specifically, if the Debtor is revested in title, the Debtor's title would necessarily be subject to CPIF's claim of $33,000,000 and Suffern's claim of $30,000,000. Also, critically, the Debtor's Estate would no longer have the benefit of the $2.5 million Claim Fund. Without the $2.5 million Claim Fund, the Debtor's Estate would long longer possess the requisite funds needed for payment toward the creditors of the Debtor's Estate.

31. The Salamon Objection also fails to address the most critical component of the Debtor's initial acquisition of the Novartis Property. Absent the CPIF proceeds of $15,940,321.51, the Debtor did not otherwise have an ability to purchase the Novartis Property. Specifically, when the Court authorized the Debtor to assume the purchase of the Novartis Property for the remaining $15,940,321.51 owed pursuant to the Novartis Agreement - the Debtor did not possess the funds it needed to complete this purchase (and did not otherwise have the apparent ability to obtain the funding). By accepting the $15,940,321.51, the Debtor ratified the subsequent transaction and should not be heard to object.

32. While there was no recorded consideration from Debtor to RS Old Mills **Rd,** LLC, the $15,940,321.51 of the CPIF mortgage loan proceeds were unequivocally used to fund the Debtor's purchase of the Novartis Property. Although the Court did not authorize the conveyance of the Novartis Property from the Debtor to RS Old Mills **Rd,** LLC and from RS Old Mills **Rd,** LLC to Suffern – absent this arrangement, the Debtor would not have been able to purchase the Novartis Property and in all likelihood would have been forced to forfeit the $2.5 million purchase deposit. Now, upon the Court's approval of the Motion - which includes the nunc pro tunc ratification of the sale of the Novartis Property from Debtor to RS Old Mills **Rd,** LLC and creation of the $2.5 million Claim Fund – all the Debtor's legitimate creditors can be paid. Based on the above, the establishment of the $2.5 million Claim Fund is clearly in the best interest of the creditors of the Debtor's Estate, as no other scenario provides for this degree of complete recovery of all claims.

### III. THE CLAIM FUND WILL PROVIDE FOR THE COMPLETE RECOVERY OF ALL ADMINISTRATIVE EXPENSES AND SECURED CLAIMS AGAINST THE DEBTOR'S ESTATE

33. As clearly addressed by the Trustee in her initial moving papers, which arguments are incorporated herein by reference, the proposed settlement not only resolves the

11

dispute between Debtor against Suffern with respect to fixing ownership of the Norvartis Property, but the proposed settlement specifically preserves any claim that the Debtor and its Estate may have against any individual or entity - including any claims that the equity holders may have against Suffern. Additionally, the infusion of the $2.5 million Claim Fund will specifically afford the Trustee further administrative resources to continue her investigation into the circumstances surrounding the availability of additional recovery options, which Salamon and the U.S. Trustee both advocate is desired.

34. The $2.5 million Claim Fund will provide for the complete recovery of all administrative expenses and claims against the Debtor's estate, as set forth below.

### A.   **CLAIM 3-1 WILL BE RESOLVED BY THE SETTLEMENT**

35. Claim 3-1 was filed by Novartis as a secured claim in the amount of $2.5 million and arises out of the $2.5 million escrow deposit the Debtor paid to Novartis pursuant to the Novartis Agreement. As the Debtor has already performed under the Novartis Agreement and tendered the remaining balance due pursuant thereto (with the proceeds from the CPIF mortgage), the Debtor's Estate will not be subject to this Claim upon the Court's acceptance of the settlement.

### B.   **CLAIMS 4-1, 5-1, AND 18-1 WERE PAID WITH THE CPIF MORTGAGE PROCEEDS**

36. Claim 4-1 and Claim 5-1 were filed by NYS Land Services, a division of Commonwealth Land Title insurance Company, both in the amount of $7,491.11 (collectively $14,982.22). These claims appear duplicative, but both allegedly arise out of services provided and expenses incurred as part of the preparation and updating of the title commitment, and performance of escrow services as part of the transfer of the Novartis Property from Novartis to the Debtor. Per the terms of the Consent Order filed on November 1, 2017, these creditors represented to have been paid in full.

37. Claim 18-1 was filed by 99 Brookside Avenue in the amount of $135,000.00 for "legal services for real estate closing and related services" performed by Cohen, LaBabera & Landrigan, LLP. Upon information and belief, Mr. Landrigan was paid $135,000.00 on account of this claim from the CPIF mortgage proceeds.

### C. CLAIMS 11-1 AND 16-1 WILL BE RESOLVED BY THE PROPOSED SETTLEMENT

38. Claim 11-1 and Claim 16-1 are duplicative and were both filed by Suffern as a secured claim in the amount of $33 million, and arise out of the Debtor's post-petition sale of the Novartis Property to Suffern. As the proposed settlement necessitates Suffern acquiring title to the Novartis Property (subject to the CPIF mortgage), the Debtor's Estate will no longer be subject to Claim 11-1 or Claim 16-1 upon the Court's acceptance of the settlement.

### D. CLAIMS 12-1 IS NOT ENTITLED TO COMPENSATION FROM THE DEBTOR'S ESTATE

39. Claim 12-1 was filed by Lone Pine Associates, LLC ("Lone Pine") as an assignee of Enbee TRST Holdings LLC ("Enbee") under two agreements that Enbee allegedly entered into with Debtor in November 2016 and "were incurred between February 13, 2017 and June 5, 2019." The total amount claimed is $311,628.42. Under the two agreements, it is alleged that Debtor hired Enbee to act as its broker to develop the Novartis Property. The Debtor's acquisition of the Novartis Property on September 1, 2017 was followed by the transfer of title to RS Old Mills Rd, LLC on September 5, 2017. Debtor's Estate could not and did not derive any benefit from this agreement, to the extent any services were even performed. As such, Claim 12-1 is not entitled to compensation from the Debtor's Estate.

### E. CLAIMS 13-1, 14-1, 15-1, & 17-1 ARE NOT LEGITIMATE CLAIMS AGAINST DEBTOR'S ESTATE

40. Claim 13-1 was filed by Ell City LLC in the amount of $160,250.00 and relates to alleged "[r]esearch, advertising, marketing, e-mail correspondence and Linkedin

13

promotion" allegedly performed between February 13, 2017 and June 5, 2019. Since the Debtor only owned the premises from September 1, 2017 to September 5, 2017, no legitimate basis for recovery exists for Ell City LLC after September 5, 2017 pursuant to Claim 13-1. Notably, Ell City previously represented it was paid. (Ecf. no. 67).

41. Claim 14-1 was filed by Romaro LLC in the amount of $315,000.00 pursuant to an alleged agreement between Debtor and Romaro LLC in November 2016 for maintenance services to be rendered by Romaro LLC upon Debtor's acquisition of the Novartis Property. The proof of claim alleges that the alleged administrative claim arose "on or after February 13, 2017 through and including June 5, 2019." Romaro LLC's performance under the agreement was contingent upon Debtor first acquiring title to the Novartis Property. As the Debtor acquired the Novartis Property on September 1, 2017 and then transferred the Novartis Property on September 5, 2017, no legitimate basis for recovery exists for Romaro LLC pursuant to Claim 14-1 except for services, if any, rendered for five days. In addition, on November 1, 2017 Romaro LLC and the other scheduled creditors filed consents with the Debtor to voluntarily dismiss the Debtor's Chapter 11 case, on the basis that all their claims had been paid in full (with the CPIF mortgage proceeds). [6]

42. Claim 15-1 was filed by Beauty Brag as an alleged administrative claim in the amount of $982,210.00 pursuant to a January 10, 2018 "Storage Agreement" between Debtor and Beauty Brag. Beauty Brag alleges that "items were warehoused in the Debtors facilities for resale and removed or converted due to the debtor's failure to properly safeguard the material entrusted to it [sic]." However, Debtor's alleged performance under said agreement was contingent on Debtor obtaining a possessory interest in the Novartis Property on January 10, 2018, which Debtor did not possess on that date. As the Debtor's Estate could not and did not

---

[6] On December 13, 2017, Romaro LLC filed an objection stating that it had not been paid in full and that $115,000.00 remained owing.

14

derive any benefit from this agreement (to the extent services were actually performed), no legitimate basis for recovery exists for Beauty Brag pursuant to Claim 15-1. Moreover, this claim is signed by David Salamon, the son of Yehuda Salamon.

43. Claim 17-1 was filed as an administrative, unliquidated claim by Continental Kosher Catering Inc. ("CKC") in the amount of $5,066,217.00 and "arises out of the Debtors' post-petition purchase and subsequent conveyance" of the Novartis Property to Suffern, and an alleged contract between CKC and Suffern that was allegedly breached by Suffern after its post-petition acquisition of the Novartis Property. This claim has no contractual relationship to the Debtor and therefore did not confer any benefit to the Debtor. No legitimate basis for recovery exists for CKC pursuant to Claim 17-1.

### F. THE REMAINING CLAIMS CAN BE FULLY SATISFIED BY THE CLAIM FUND

44. Claim 1-1 and Claim 8-1 are duplicative and were filed by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz") in the claimed amount of $201,083.46, and allegedly arise from pre-petition legal services and associated expenses performed by Mintz for the Debtor's benefit.

45. Claim 2-1 was filed by filed by AKRF CONSULTING SERVICES, INC. f/k/a AKRF, INC. ("AKRF") as an alleged administrative expense in the amount of $38,446.47 and relates to alleged pre-petition services performed by AKRF.

46. Claim 7-1 was filed by M. David Graubard, Esq. in the amount of $4,531.30 and allegedly relates to professional services rendered prior to Debtor's filing of its Chapter 11 petition.

47. Claim 9-1 was filed by Pick & Zabicki LLP ("Pick") as an administrative claim in the amount of $181,934.65, and includes professional fees in the amount of $179,005.00 and expenses in the amount of $2,929.65, both allegedly incurred between February 13, 2017 to

15

June 4, 2019 by Pick as Debtor's Court authorized bankruptcy counsel. However, Mr. Pick allegedly received payments totaling $134,225.00, which are being held against its legal fees and expenses incurred in the case. Mr. Pick alleges to be owed a net 47,709.65 net of such payments. Notably, Mr. Pick has not sought Court approval of his fees for services rendered.

49. Claim 10-1 was filed by Frances M. Caruso as an administrative claim in the amount of $1,250.00 allegedly incurred from February 13, 2017 through November 2, 2017 by Caruso as professional fees in connection with her retention as bookkeeper to the Debtor. However, Caruso alleges to have received payment in the amount of $1,200.00 and alleges to be owed a net $50.00.

## CONCLUSION

49. As identified above, the proposed settlement provides for the full payment of all administrative expenses and/or allowed claims against Debtor's Estate. For these reasons, and the reasons provided in the Trustee's initial moving papers, the Objections do not challenge the settlement's value to the Debtor's Estate or, for that matter, any ground relevant to its approval pursuant to this Motion. In addition, the proposed settlement contained in the Stipulation of Settlement is in the best interests of the creditors of the Debtor's Estate, and does not "fall below the lowest point in the range of reasonableness." In re Teltronics Serv., Inc., 762 F.2d 185 (2d Cir. 1985).

**WHEREFORE**, it is respectfully request that the Court entered the Proposed Order approving the Stipulation of Settlement and grant the Trustee such other and further relief as may be just and appropriate.

Dated: New York, New York
October 1, 2019

        BUTLER, FITZGERALD, FIVESON
        &amp; McCARTHY
        A Professional Corporation
        Attorneys for CPIF Lending, LLC

By: _____
        David K. Fiveson
        A Principal of the Firm
        9 East 45th Street, Ninth Floor
        New York, New York 10017
        (212) 615-2200

17