Kevin J. Nash, Esq.
**Goldberg Weprin Finkel Goldstein LLP**
1501 Broadway, 22nd Floor
New York, New York 10036
Phone: (212) 221-5700

Michael Levine, Esq.
**Levine & Associates, P.C.**
15 Barclay Road
Scarsdale, NY 10583
Phone: (914) 600-4288

*Co-counsel for Yehuda Salamon*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------X
In re:
                                                                    :   Case No. 17-22218 (RDD)
**RS OLD MILL, LLC,**            ,
                                                                    :   Chapter 7
                         **Debtor**
---------------------------------------------X

## AFFIRMATION

**MICHAEL LEVINE**, an attorney duly admitted to practice law in the Courts of the State of New York, and the United States District Court for the Southern District of New York, affirms the truth of the following, under the penalty of perjury and pursuant to CPLR Rule 2106:

1. I, together with Kevin Nash, Esq. and another firm, am co-counsel to Yehuda Salamon, the principal of Plaintiff in the within action and, as such, am fully familiar with all of the facts and circumstances as are hereinafter set forth.

2. This Affirmation is submitted in response to the false and unjustifiable personal attack leveled against me that the Chapter 7 Trustee apparently believes appropriate and/or necessary to

"justify" what is clearly a bad business decision on her part. While I do not fault the Chapter 7 Trustee for advocating (albeit illogically) for the "reasonableness" of the Settlement that she seeks to have this Court approve, I cannot stand silent in the face of her unwarranted and *ad homonym* attacks on me.

## THE CHAPTER 7 TRUSTEE RESPONSE

3. After acknowledging that "there can be no doubt that there were many irregularities during the Chapter 11 period including, but not limited to ... the transfer of Properties without an Order of the Court ..." [O'Toole Reply, p. 2], the Chapter 7 Trustee asserts that "the Trustee concluded in her best business judgment that the settlement embodied in the Stipulation is fair, reasonable and in the best interests of the Debtor's estate" [O'Toole Reply, p. 5] and "falls well above the lowest point in the range of reasonableness and should be approved." [O'Toole Reply, p. 6].

4. The Chapter 7 Trustee based her conclusion in that regard on the assertions that the Debtor's principal (Yehuda Salamon) as well as the Debtor's "multiple counsel" (including your Affiant), were aware that "Suffern took title to the Properties" and that "Suffern obtained a $33,000,000 loan that both funded the Debtor's purchase of the Properties from Novartis and Suffern's purchase of the Properties from RS Old Mills RD LLC." *Id.*

5. Further, the Chapter 7 Trustee alleges that "any newly alleged conspiracy by Salamon and Levine is belied by the documentary evidence from 2017 when these transactions occurred,"[1]

---

[1] The Chapter 7 Trustee's allegation of some "newly alleged conspiracy" is difficult to understand. The facts surrounding transfer of the Novartis Property out of the hands of the Debtor for less than fair consideration was set forth in detail in the Adversary Complaint that was filed on March 29, 2019, more than *six months ago*. There is no "newly created" conspiracy, and Mr. Salamon's Objections (as were the United States Trustee's Objection), filed a week ago, were based on the facts alleged in the Adversary Complaint (and now corroborated by additional documentary

2

and further alleges that your Affirmant "opined that Bankruptcy Court approval of the Debtor's sale of Properties was not required." Finally, the Chapter 7 Trustee alleges that your Affirmant, together with Salamon, purportedly "orchestrated" the very transactions at issue here. [O'Toole Reply, p. 3]. These allegations are all completely false and not based upon any evidence before this Court (or anywhere).

6. Indeed, the primary document that the Chapter 7 Trustee points to, purportedly "supporting" those allegations, is an August 23, 2017 responsive e-mail that I sent to Douglas Pick,

---

evidence). Moreover, in my Response to the objections to my firm's retention as special litigation counsel in the ten Chapter 11 case, I synopsized the issue as follows:

> 2. Simply stated, or about November 28, 2016, the Debtor entered into a written contract of sale with Novartis Corporation (the "Novartis-Debtor Contract of Sale"), whereby Debtor agreed to purchase from Novartis Corporation certain developed real property situated in Rockland County (the "Old Mill Road Property") for a purchase price of $18 million.
>
> 3. The Debtor tendered a down payment of $2,500,000.00, and then (on or about November 28, 2016) the Debtor entered into a financing agreement with Defendant Bridgewater Capital Partners ("Bridgewater"). That financing agreement (the "Bridgewater Agreement") provided, *inter alia*, that Bridgewater would obtain (from an outside source), or itself provide, a loan in the amount of Eighteen Million ($18,000,000.00) to Debtor as financing for the acquisition of the Old Mill Road Property.
>
> 3. Thereafter, and through a series of fraudulent transactions described in the Adversary Proceeding Complaint, the Debtor was divested of its interest in the Old Mill Road Property. The sale of the property from Novartis to the Debtor closed on September 6, 2017, however, the Debtor immediately reconveyed the property to an entity called RS Old Mills Road LLC for no consideration, which entity simultaneously reconveyed the property to an entity called Suffern Partners LLC, purportedly for $30 million. The $12 million difference between the $18 million purchase price to Novartis and the purported $30 million sale price to Suffern was never received by the Debtor, and the Debtor was never reimbursed for the $2.5 million deposit it originally made to Novartis.

Those facts have *never* changed from their original assertion in the Adversary Proceeding Complaint to the Supplemental Objection filed on behalf of Mr. Salamon.

3

Esq., the Debtor's then-bankruptcy attorney. For ease of reference, a copy of the same is annexed hereto and labeled Exhibit "1".

7. By way of background, and as I related in my Affirmation in support of my firm's motion for retention as special litigation counsel to prosecute the Adversary Proceeding Complaint in the Chapter 11 case, in February of 2017 I was advised by Mr. Salamon that the Debtor, an entity of which Mr. Salamon was the principal, had filed the bankruptcy petition in this Court. Mr. Salamon requested, at that time, that I consult with the Debtor's bankruptcy counsel, Douglas Pick, Esq., and give input on strategic issues, requests for relief, and documents presented to this Court, however I was not compensated by the Debtor for those services and was never formally retained.

8. Nonetheless, I performed those services at the request of Mr. Salamon. Insofar as I was aware, the Debtor was being represented by Defendant Thomas Landrigan (as real estate counsel) and another lawyer, Steven Friedman, Esq., in connection with the Novartis negotiations and closing, and Douglas Pick, Esq. (as bankruptcy counsel), in connection with doing whatever was necessary to protect the Debtor's interests and/or make necessary disclosures in this bankruptcy proceeding.

9. In that regard, I came to learn that a closing on the Novartis Property sale to the Debtor had been scheduled for September 6, 2017. At some point shortly before the scheduled closing, I was advised that there had been some discussion regarding the Debtor possibly reselling the Novartis Property to another purchaser for $30,000,000.00, its principals furnishing the funds to pay its creditors, and discontinuing the bankruptcy proceeding. I am not a bankruptcy attorney, and I wanted to make sure that the Debtor was doing whatever was necessary to comply with whatever requirements it had regarding disclosure and/or obtaining approval from the Court for any subsequent sale of the Novartis Property. When I consulted Doug Pick about that, he advised

me that a subsequent sale by the Debtor for consideration greater than what it had purchased the Novartis Property for would *not* require Bankruptcy Court approval because it was "in the ordinary course of business." I was satisfied with Mr. Pick's explanation which, I assumed, was based upon his expertise in the bankruptcy field. I did not independently research the issue at that time.

10. However, it must be understood that that conversation was in the context of a possible purchase of the property by the Debtor, and a single subsequent sale by the Debtor to a purchaser who would pay the Debtor more than what the Debtor had paid for the property; that the proceeds to the Debtor would be sufficient to pay all creditors; and that a motion to dismiss the bankruptcy petition (which would, of necessity, disclose the subsequent sale by the Debtor and the consideration received by the Debtor) was what was being discussed.

11. On August 23, 2017, I was advised by Mr. Pick that he had had a conversation with a title company representative who wanted an opinion that the Debtor's purchase and resale of the Novartis Property for profit was a permitted transaction. Mr. Pick advised me that he intended to respond to that request via email and asked if I wanted to see the response in advance of it being sent, to which I replied that I did.

12. On August 23, 2017, Mr. Pick sent me a draft of the e-mail that he intended to send to the title company. That is the first e-mail on the first page of Exhibit "1". When I receive it, I noted that Mr. Pick stated that (italicized emphasis in original; bolded emphasis added):

> The Debtor is not restricted in any fashion from subsequently selling the property (*by way of example only* it could proceed to buy another property for the same price so as to possibly avoid capital gains tax and also sell that property), or subsequently selling tracts of land on the property, or subsequently selling tracts of land on the property, or subsequently leasing the property, since all of these actions could be deemed in the ordinary course of the operations of the Debtor. You should be aware that it is our intention to file an application to dismiss the chapter 11 case immediately following **the *two* contemplated closings on the Property**. I hope that this helps.

5

13. That draft e-mail was entirely consistent with what Mr. Pick had previously told me and consistent with what I was told was being discussed – **two** (not three) transactions: (i) the purchase by the Debtor o the Novartis Property and, (ii) a possible subsequent sale by the Debtor to another entity that would pay the Debtor significantly more for the Novartis Property.[2]

14. When I read Mr. Pick's proposed e-mail, however, I saw that he had *not* included in the e-mail what he had told me, and what I thought was necessary to protect the Debtor, *to wit* that that purchase and profitable resale did not require Bankruptcy Court approval. I wrote back to him (the second page of Exhibit "1"): "Doug: *are you OK with* the following highlighted changes" and inserted the proposed phrase "Bankruptcy Court approval for these transactions is, therefore, not required under the Bankruptcy Code" in his proposed email (emphasis added).

15. The Chapter 7 Trustee somehow translates that responding e-mail from me as evidencing that I "opined that Bankruptcy Court approval of the Debtor's sale of the Properties was **not** **required**" (emphasis in original). I never, ever, opined to *anyone* that bankruptcy court approval was, or was not, necessary, with respect to any aspect of the Novartis transaction because I do not (or at least did not in August of 2017) know whether it was or was not required. The Chapter 7 Trustee's demonstrably false allegation that I did so – based (apparently) *only* upon an

---

[2] Mr. Pick never told me that there was, in fact, *three* transactions being discussed, including an intermediate one where the Debtor was going to transfer the Novartis Property for no consideration to a third entity. At a prior oral argument in the then Chapter 11 case, Mr. Pick stated on the record (insofar as I recall) that he was not aware of the third, intermediate, transaction in advance of its occurrence. I do not know whether that representation was true or not, however I can state to the Court that, insofar as my brief contemporaneous discussions with Mr. Pick were concerned, his statements to me were consistent with the fact that he thought that there was only going to be two potential transactions, one where the Debtor purchased the Novartis Property and one where it sold the Novartis Property for a profit to another purchaser. I can also advise the Court that Mr. Pick believed (insofar as he told me) that the latter transaction did *not* require Bankruptcy Court approval.

6

email to bankruptcy counsel asking whether the inclusion of such a statement *by him* in an email that *he* was going to send was appropriate – is absolutely outrageous.[3]

16. Similarly, I absolutely resent and deny the Chapter 7 Trustee's equally outrageous and defamatory allegation that:

---

[3] The Chapter 7 Trustee's shoddy "analysis" of that e-mail is also demonstrated by her erroneous allegation that Mr. Pick's final e-mail (page 3 of Exhibit "1") was sent "to, among others, the title company and *counsel for Novartis*." [O'Toole Reply, ¶ 9, emphasis added]. In fact, as is clear from the face of the e-mail, the same was sent to the title company representative (Paul Reisman), Heidi Sorvino (counsel to Bridgewater) and Mr. Salamon. The e-mail was *not* sent to "Novartis's attorney." I do not mean to raise that picayune issue to establish any substantive point; rather I raise it just to point out that the Chapter 7 Trustee's conclusion as to the events that took place here, which she states were derived from a "thorough" investigation, were, perhaps, not entirely supported by the evidence that she did, and did not yet, see.

By way of one of a number of examples, although the Chapter 7 Trustee alleges that "CPIF [the lender] required ... a show of equity" from Suffern in order to close on the transaction" and that, as a result, a short term loan was made and repaid within three days of closing from a client of attorney Treff [O'Toole Reply, ¶ 15]. However, this purported "loan" was fraught with fraud for several reasons. First, the representation that Suffern made to CPIF was that Suffern had in fact *contributed equity* to the deal of $12.5 million (*not* that it had made a "short-term loan"). Secondly, Bridgewater's principal, Isaac Genuth, specifically misrepresented that his company, My Group Holdings LLC (the "My" standing for Mark Yunger, Genuth's partner), had made the payment by purportedly delivering checks to the Debtor aggregating $11,700,000.00. Copies of these checks are annexed hereto and labeled Exhibit "2". In his subsequent email to CPIF, Genuth. Responding to an inquiry from CPIF as to the source of those funds, falsely claimed that he had sent those checks to the Debtor and then replaced the same with his wire transfer. A copy of that email is annexed hereto and labeled Exhibit "3". Thus, Genuth made it appear as if Suffern/Bridgewater was the source of the equity funds that CPIF required be posted (and which was ultimately supposed to be the excess payment to the Debtor over the Novartis contract purchase price). Undoubtedly, the Chapter 7 Trustee has never seen these check or this e-mail when she "concluded" that the $12,500,00 was nothing but a "short term loan."

The salient point is that these matters are far too important for there to be a rush to judgment absent a thorough analysis of *all* of the relevant documents and evidence, appropriate inquiry under oath of all relevant persons, and a hearing before the Court.

Separately, and returning to Mr. Pick's final e-mail (page 3 of Exhibit "1"), the fact that the above-referenced e-mail from Mr. Pick was sent to Mr. Salamon, and contained a statement by his bankruptcy attorney that the contemplated transaction did not require Bankruptcy Court approval, is entirely consistent with Mr. Salamon's repeated and consistent contention that he was simply following the advice and direction of Mr. Pick (his bankruptcy attorney) and Thomas Landrigan (his purported real estate attorney, who was in reality clandestine counsel for Bridgewater/Suffern).

7

Salamon, Levine and the Debtor's various counsels were intimately and contemporaneously involved in the transfer of the Properties … [yet] … Salamon and Levine nevertheless have the shameless audacity to assert now that the very transaction they orchestrated and approved is "a highly irregular sales transaction" and "a carefully calculated and engineered scheme to directly defraud *this* Court …

17. O'Toole Reply, p. 3. The Chapter 7 Trustee's *outrageous* allegation that I "orchestrated and approved" a transaction which was intended to (and did) divest my client of an interest in a very valuable piece of real property for no consideration, and resulted in the loss by my client of $2.5 million of its own funds, is *entirely* false and based upon no evidence whatsoever. Indeed, the *only* purported "evidence" offered by the Trustee on that topic is no evidence *at all* of any purported "orchestration" by me in the pre-closing *structure* of the Novartis transaction – I had no such involvement. All that the Chapter 7 Trustee offers is my October 2, 2017 e-mail and subsequent negotiations – all *after the fact* of the September 6, 2017 closing of the Novartis transaction – seeking to resolve the **after closing** disputes between the parties. How that can possible translate to any preclosing orchestration" is a mystery.

18. Moreover, the Chapter 7 Trustee misses the point as to the fraud on the Court that took place here. The "fraud" does *not* consist of the fact that the Court was not made aware that the Debtor purchased and then transferred the Novartis Property to Suffern (as the Chapter 7 Trustee and Suffern erroneously portray the transaction), although such a transaction (absent prior Bankruptcy Court approval) is nonetheless void *ab initio* (fraud or otherwise). The fraud here is that the Debtor transferred the Novartis Property *to a shell entity created by Suffern and Bridgewater for no consideration and without Court approval.*[4]

---

[4] Suffern, in its response to Salamon's Objection, contends that there *was* consideration in that certain "creditors" were paid at the closing. But those "creditors" were entities that were directly involved in the closing and the payment of those entities did not inure to the benefit of the Debtor, it inured to the benefit of Suffern/Bridgewater, the ultimate recipient of the Novartis Property.

8

19. Had the structure of the transaction been disclosed to the Court in advance of the closing, i.e., that the Debtor would receive no (or, at least, inadequate) consideration for the sale of its sole asset, it is extremely unlikely that the transaction would have been approved by this Court – which is *precisely* why Bridgewater/Suffern engineered a scenario where the true nature of the transaction was hidden from, rather than disclosed to, this Court.

20. But even if the transaction in the form it was culminated in would have been approved by the Court had it been properly disclosed in advance (which it would not have), at the very least the Debtor's interest in the acquiring entity and/or the Debtor's right to the $12 million in excess funds from the resale would have been protected under those circumstances by whatever approval order would have been issued by the Court.

21. In short, what is before the Court is a situation where integrity *must* prevail over expediency. While it is "easier" to just allow Suffern to buy its way out of its misconduct, allowing it to do so impugns the entire Bankruptcy process and the integrity of this Court. Suffern/Bridgewater and their principals are not "innocent purchasers for value;" they are fraudsters who, knowing that the Debtor was in bankruptcy, and knowing that this Court's approval was *de facto* necessary in order for the Debtor to sell its sole asset, sought to abscond with the Debtor's valuable property rights without putting up a single dime and then attempted (thankfully, now unsuccessfully) to hide their machinations from the Court.

22. If the Chapter 7 Trustee erroneously believes that Salamon or I were "involved" in (or "orchestrated") those machinations,[5] that does not change the fact that the Debtor's property was transferred without the permission of this Court, in violation of at least two statues which render

---

[5] The Chapter 7 Trustee knows where I am and can level whatever charge she believes to be appropriate. I am not going anywhere.

9

such transfer void *ab initio*, and solely for the *exclusive* benefit of Suffern/Bridgewater. The Debtor did not receive *any* benefit from the transaction.

23. This is simply not a situation where the Chapter 7 Trustee should reach a determination as to which side is right or wrong based upon a fairly short "investigation," and, respectfully, upon a misreading or misinterpretation of the small universe of documents that have been given to her. This is not, despite the Chapter 7 Trustee's conclusion to the contrary, a "dispute as to ownership" of an entity. It is a situation of *acknowledged* violations of longstanding bankruptcy procedure and crystal-clear statutes that requires a full trial (or at least a hearing) before the Court (or a Referee) to ferret out the facts. Perhaps, at the conclusion of that trial, the Court will conclude that approving a settlement and issuing a *nunc pro tunc* approval of the sale of the Debtor's sole asset without consideration is appropriate. Or perhaps it will not. But, as the United States Trustee expressed, that decision should not be made after a fairly short and frenzied inquiry, or before all of the facts can be ferreted out before the Court.

24. While we recognize that the Chapter 7 Trustee's business judgment is normally afforded great weight, we believe (respectfully) that her judgment is being clouded by her erroneous conclusion that Salamon was somehow a willing participant in the loss of the Debtor's property and its $2.5 million down payment. The evidence as a whole is to the contrary. But, more salient is that, whether Salamon was or was not a knowing participant, the transaction was unquestionably void as a matter of law, and making a deal with the recipient of the void transaction cannot possibly be in the beast interests of the bankrupt estate, bankruptcy procedure or the integrity of this Court.

25. Indeed, after admitting that a counteroffer received from Mr. Salamon is in a "higher amount" than the one the Chapter 7 Trustee seeks to now have this Court approve, the Chapter 7

10

Trustee asserts that Mr. Salamon's offer "is not comparable or analogous to the settlement embodied in the Stipulation" [O'Toole Reply, ¶ 43]. But the only "justification" for that conclusion is the Chapter 7 Trustee's assertion that Mr. Salamon's offer does not address the purported "substantial claim that would arise against the Debtor's estate in the unlikely event that Salamon overcame Suffern's motion to dismiss the Adversary Proceeding and obtained a final, non-appealable judgment setting aside the deed transferring title to the Properties to Suffern." [O'Toole Reply, ¶ 44]. The Chapter 7 Trustee also notes that "Suffern has already filed proof of a contingent, secured, administrative, unliquidated claim in an amount not less than $33,000,000.

26. But the Chapter 7 Trustee has presented no *legal* support for that assertion whatsoever. In fact, as set forth in Salamon's Supplemental Objection, there are no *possible* facts upon which Suffern can conceivably succeed in any claim against the Debtor. Suffern (according to it) had *no* direct dealings with the Debtor, but instead purchased from another entity, RS Old Mills Rd, that Suffern and Bridgewater themselves caused to be formed. The Debtor never made *any* representation to Suffern as to the validity of its transfer of the property to RS Old Mills Rd (nor does Suffern claim that the Debtor did so) and, in any event, Suffern now admits that it knew that the transfer was made without Bankruptcy Court approval. There is simply no way that Suffern (or anyone else) could possibly support any claim against the Debtor, as a matter of either law or fact, under those circumstances.

27. Moreover, Suffern has recourse against either the title company who insured its title, or against its own attorney, who issued an opinion letter falsely representing that Bankruptcy Court approval was not necessary for the Novartis transaction. Suffern, therefore, cannot possibly assert any viable claim against the Debtor.

11

28. Moreover, far from it being "unlikely" that the Debtor would succeed in a motion by Suffern to dismiss the Adversary Proceeding Complaint (as advanced by the Chapter 7 Trustee), it is virtually *certain* that the Debtor would prevail on a motion for summary judgment against Suffern setting aside the transfer of the Novartis Property to RS Old Mills Rd, and then to Suffern, as those transaction were void *ab initio* as a matter of at least two statutes.

29. While it is true that the Debtor (or whoever purchased the Adversary Proceeding claim) would be embroiled in litigation with Suffern for the short time that it would take to make a summary judgement motion (not, as the Chapter 7 Trustee asserts, "in perpetuity"), there would be a readily available fund from which creditor's, administrative and litigation expenses would be paid. And, at the end of the day, the bankrupt estate would be in possession of an asset worth over $100 million.

30. In short, the Chapter 7 Trustee's business judgment in accepting the "settlement" offer from Suffern was, it is respectfully submitted, *extremely* flawed, not based upon a thorough analysis of the law applicable to a transfer of property in violation of the automatic stay and other statutory requirements, and consequently falls well below the lowest point in the range of reasonableness. The proposed settlement is not fair (it trades a $100 million asset for the "waiver" of an unenforceable claim of $33 million, and requires the Debtor to return the $2.5 million "fund" put up by Suffern if the Chapter 7 Trustee receives adequate funds from any other sources to pay creditors and administrative expenses); it does *not* "resolve" the existing Adversary Proceeding, it only waives one claim thereunder; and, in view of the other and higher offers presently on the table, is simply not reasonable.

31. For those reasons, the unwarranted and false attacks on me should be rejected by this Court, and the Chapter 7 Trustee's motion for approval of the Settlement with Suffern should be

12

denied for the reasons set forth in (i) Salamon's original and Supplemental Objections, and (ii) the Objection of the United States Trustee.

_____<br>Michael Levine

Duly Affirmed this
3rd day of October, 2019